5079, 5080.  WESTERN UNION TELEGRAPH COMPANY *v.* WATSON; and *vice versa.*

RUSSELL, C. J.  1. The plaintiff was entitled to recover the penalty allowed by law for the telegraph company's failure to promptly transmit and deliver the message, but the damages are too remote and speculative to authorize the recovery awarded. The alleged agreement was too vague and indefinite in its terms to constitute a contract, even if the authority of the alleged agent of the railroad company was conceded.

2. The court erred in overruling the motion for a new trial. The case is controlled by the ruling of this court in *Bashinski* v. *W. U. Tel. Co.*, 1 *Ga. App.* 761 (58 S. E. 91), and by the rulings of the Supreme Court in *Clay* v. *W. U. Tel. Co.*, 81 *Ga.* 285 (6 S. E. 813, 12 Am. St. R. 316); *Western Union Tel. Co.* v. *Watson*, 94 *Ga.* 202 (21 S. E. 457, 47 Am. St. R. 151); *Wilson* v. *W. U. Tel. Co.*, 124 *Ga.* 131 (52 S. E. 153). Where, in an action brought against a telegraph company by the addressee of a message, a breach of duty is alleged, compensatory damages can not be recovered unless the facts show an injury proximately resulting from the tortious act. The plaintiff failed to show that the proposal to contract was made by an agent of the railroad company authorized to make the contract in behalf of that company; and for that reason it is not certain that a contract would have resulted, even if the message had been delivered in time and the plaintiff had acted promptly upon the information which it was intended to convey.

3. The amendment offered by the plaintiff merely amplified the statement as to the basis of the cause of action, and no portion of it was subject to be stricken. *City of Columbus* v. *Anglin*, 120 *Ga.* 785 (48 S. E. 318).

*Judgment reversed on each bill of exceptions.*

DECIDED NOVEMBER 25, 1913.

Appeal; from Greene superior court—Judge Park.  July 1, 1913.

B. D. Watson brought suit in the county court of Greene county against the Western Union Telegraph Company, and on appeal the case was tried in the superior court. The petition alleged, in substance, that on October 3, 1911, the plaintiff's brother, L. B. Watson, filed with the defendant's agent at Augusta, Georgia, a telegram addressed to the plaintiff, in these words: "B. D. Watson, Union Point, Ga. Job as yard conductor waiting you. Come on first train" (signed); that the defendant had an agent and an office in Union Point, Georgia, but the telegram was not transmitted to

the agent at Union Point until October 23, 1911, and was not received by the plaintiff until that date; that L. B. Watson had secured for the plaintiff a position as extra yard-conductor with the Charleston and Western Carolina Railroad Company at Augusta, Georgia, at a salary of $110 per month, the employment to date from October 4, 1911, and to continue until March 1, 1912, or longer; that the position was open to him until 2 o'clock p. m. October 4, 1911, but that because of the delay in transmission of the telegram he was unable to reach Augusta until after that time; that in response to a letter received at 5:30 o'clock on that day he went to Augusta on the next train and found that the position was no longer open to him; that if the telegram had been received by him at the time it should have been delivered to him, he would have been able to reach Augusta when the position was still open to him and could have complied with the contract; that L. B. Watson had authority to accept for him employment as such extra yard-conductor at $110 per month for the time specified, and the said contract was entered into in behalf of the Charleston and Western Carolina Railroad Company by an agent who had full authority to employ extra yard-conductors for the said company. The petition alleged prepayment of the usual charge for transmission of the telegram, and negligence in failing to transmit. It was alleged that the plaintiff's salary as extra yard-conductor from October 4, 1911, until March 1, 1912, would have been $550, that he secured other work which paid him a salary of $150 during that period, and he was damaged in loss of salary by the said negligence in the sum of $400, for which sum he sued, and also the expense of his trip to Augusta, $10. He sued also for the penalty of $25 provided for in section 2812 of the Code of 1910.

In an amendment to the petition the plaintiff alleged, in substance, that the position secured for him by L. B. Watson was secured through one H. S. Pentecost, who was night yard-master for the said railroad during October, 1911; that the said Pentecost had full authority from the said railroad company to employ extra yard-conductors; and that on account of the facts stated in the petition, the plaintiff was unable to arrive in Augusta in time to comply with his contract with the railroad "or with H. S. Pentecost." The amendment was allowed, except the words "or with H. S. Pentecost," which the court struck as adding a new cause of

action. The defendant in its answer denied the material allegations of the petition. The verdict was for $80 damages, and $25 penalty. The defendant made a motion for a new trial on the usual general grounds and on numerous other grounds; the motion was overruled, and it excepted. The cross-bill of exceptions contains an exception to the striking of the words "or with H. S. Pentecost" from the amendment to the petition.

At the trial L. B. Watson testified: "In October, 1911, I lived in Augusta. . . I had some correspondence with my brother relative to securing him a position in Augusta. . . I saw Mr. Pentecost. He was in need of a man, and told me to get my brother down there and he would give him a job. That was October 3, 1911. Mr. Pentecost told me if I would wire him and get him down there, he would give him a job, and hold the job open until the afternoon of the next day. That job was to last from October until March, during the busy season. If the services were satisfactory, the job would have been permanent. He was to receive $110 per month. I went to the Western Union Telegraph Office on Broad Street and delivered them a message. That is the original message. I also wrote a special-delivery letter and mailed that to him on the afternoon train. He came on the night of the 5th, twenty-four hours late. He went to see Mr. Pentecost, and he told him that he wanted him the night of the 4th, and when he did not come he had to get a man. . . I had been working with this railroad about a year and a half at that time. . . Mr. Wallace at that time was the general yard-master; he was over Mr. Pentecost. What Mr. Pentecost did, Mr. Wallace had to approve or disapprove. . . Mr. Pentecost's right to employ a man was subject to Mr. Wallace's approval. I knew if he came there and Mr. Pentecost said, 'Go to work,' and Mr. Wallace said he did not want him, he would not have a job; he reserved that right. . . If you violated a rule, they reserve the right to discharge you; irrespective of a violation of the rule, they could lay you off to-morrow. They do not do that if they have enough work to authorize them to hold you; if they do not find anything for you to do, they put you off. . . My brother authorized me to get him a job as conductor with any railroad. . . Mr. Pentecost said the job would last through the season and longer, provided the work held up and his services were satisfactory. That was all he said. There was no

binding agreement for any specified length of time. I knew if my brother came there and started to work and was not satisfactory to Mr. Pentecost, or Mr. Wallace did not want him, they would have a right to say, 'Mr. Watson, here is your money. We do not want you.' . . Mr. Pentecost was night yard-master at Augusta of the C. & W. C. Railroad Company, and Mr. Wallace was general yard-master. The rule is that if anybody was employed by Mr. Pentecost he would tell Mr. Wallace what he had done, and Mr. Wallace would say, 'All right;' and the man had a job. I do not know that if Mr. Wallace had said that he did not want the man he would not have a job. If Mr. Pentecost told Mr. Wallace he had hired a man, he would not discharge him without cause. I do not know whether Mr. Pentecost could give a man a job if Mr. Wallace did not want him. . . Neither Mr. Pentecost nor Mr. Wallace had the right to discharge a man without cause." The plaintiff testified as to the delay in receiving the telegram and his loss by failure to obtain the employment in question.

W. A. Wallace testified that in October, 1911, he was general yard-master of the Charleston and Western Carolina Railroad in Augusta; that Pentecost was night yard-master, but had no authority on behalf of the company to employ yard-conductors without referring the matter to him (Wallace), and did not refer to him the proposition as to the employment of B. D. Watson, and was not authorized to make a contract of employment with Watson; and that neither he (Wallace) as yard-master nor Pentecost with his approval, had authority to employ men for any definite period. Yard-conductors at that time were paid by the hour, 33 cents an hour. The general yard-master had a right to lay off a man at any time he saw fit. The fall of 1911 was a busy season; there were many extra cars to handle, and the yards were crowded. The general yard-master hired and discharged the men that Pentecost had. "If Pentecost wanted a man and knew there was a good man, he could hire him, and I would give him that authority. That particular trade between Pentecost and L. B. Watson could not be for a definite time. Mr. Pentecost had no such authority. In the instance of hiring any man by Mr. Pentecost for a job, I had to approve that particular man." A man has a right to quit whenever he gets ready.

*Dorsey, Brewster, Howell & Heyman, Noel P. Park,* for the telegraph company. *Lewis, Davison & Lewis,* contra.